**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| RYAN KARNOSKI, *et al.*, | |
| Plaintiffs, and | |
| STATE OF WASHINGTON, | Misc. No. 1:20mc16 |
| Plaintiff-Intervenor, | Underlying Action: Case No. 2:17-cv-01297-MJP (W.D. Wash.) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO SECRETARY OF VETERANS AFFAIRS ROBERT WILKIE JR.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.     DoD Policy Regarding Military Service by Transgender Individuals and Individuals with Gender Dysphoria ........................................................................... 2

    II.    Underlying Litigation.................................................................................... 7

LEGAL STANDARD..................................................................................................... 10

ARGUMENT ................................................................................................................. 11

    I.     The Deposition of a Sitting Cabinet Secretary Should Not Be Ordered Absent Extraordinary Circumstances...................................................................... 11

        A.  High-Ranking Officials Are Generally Protected from Testifying About Their Official Decisions....................................................................... 11

        B.  That Secretary Wilkie Is Being Asked to Testify About His Former Role Does Not Change This Presumption.................................................... 15

    II.    Secretary Wilkie's Deposition is Especially Inappropriate in This Case in Light of the Deference Owed by Courts to Military Judgments................................ 17

    III.   Plaintiffs Cannot Establish that Exceptional Circumstances Require Secretary Wilkie's Deposition. .................................................................................. 20

        A.  Plaintiffs Cannot Demonstrate That the Secretary Has Unique Information Relevant to Their Claims. ................................................................... 20

        B.  The Information Plaintiffs Seek from Secretary Wilkie is Protected or Privileged. ......................................................................................... 25

CONCLUSION............................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. FBI*,
    186 F.R.D. 1 (D.D.C. 1998) ............................................................... 16

*Bogan v. City of Boston*,
    489 F.3d 417 (1st Cir. 2007) ................................................ 11, 13, 24

*Byrd v. District of Columbia*,
    259 F.R.D. 1 (D.D.C. 2009) ............................................................. 16

*Cipollone v. Liggett Group, Inc.*,
    812 F.2d 1400 (table) (4th Cir. 1987) ............................................. 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ......................................................................... 12

*Cmty. Fed. Savings & Loan v. Fed. Home Loan Bank Bd.*,
    96 F.R.D. 619 (D.D.C. 1983) .......................................................... 13

*Croddy v. FBI*,
    No. 00-cv-0651, 2005 WL 8168910 (D.D.C. Mar. 30, 2005).............. 12

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .......................................................... 12, 13, 26

*Doe 2 v. Shanahan*,
    755 F. App'x 19 (D.C. Cir. 2019) .................................................... 20

*Doe DC v. Esper*,
    No. 17-1597, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) .................. 8, 22

*Doe DC v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019) ................................................. *passim*

*FDIC v. Galan-Alvarez*,
    No. 1:15-mc-00752, 2015 WL 5602342 (D.D.C. Sept. 4, 2015)........... 11, 15, 21, 25

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ......................................................................... 18

*Franklin Sav. Ass'n v. Ryan*,
  922 F.2d 209 (4th Cir. 1991) ....................................................................... 11, 26

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ............................................................................................. 19

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ......................................................................................... 18

*In re Cheney*,
  544 F.3d 311 (D.C. Cir. 2008) ...................................................................... 11, 22

*In re Commodity Future Trading Comm'n*,
  941 F.3d 869 (7th Cir. 2019) ............................................................................ 11

*In re Dep't of Commerce*,
  139 S. Ct. 16 (2018) ........................................................................................ 12

*In re FDIC*,
  58 F.3d 1055 (5th Cir. 1995) ............................................................................ 11

*In re McCarthy*,
  636 F. App'x 142 (4th Cir. 2015) .................................................................. 10, 11

*In re Stone*,
  986 F.2d 898 (5th Cir. 1993) ............................................................................ 15

*In re United States ("Holder")*,
  197 F.3d 310 (8th Cir. 1999) .......................................................................... 11, 25

*In re United States ("Jackson")*,
  624 F.3d 1368 (11th Cir. 2010) ..................................................................... 19, 25

*In re United States ("Kessler")*,
  985 F.2d 510 (11th Cir. 1993) ........................................................................ 11, 13

*In re United States*,
  542 F. App'x 944 (Fed. Cir. 2013) ................................................................... 21

*Intelligent Verification Sys., LLC v. Microsoft Corp.*,
  No. 2:12-cv-525, 2014 WL 12544827 (E.D. Va. Jan. 9, 2014) .................... 10, 20, 25

*K.C.R. v. Cty. of Los Angeles*,
No. CV 13-3806, 2014 WL 3434257 (C.D. Cal. July 11, 2014) ............................................ 15

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .......................................................................................... *passim*

*Lebron v. Rumsfeld*,
670 F.3d 540 (4th Cir. 2012) .................................................................................................. 19

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
731 F.3d 199 (2d Cir. 2013) ................................................................................... 11, 13, 20

*Low v. Whitman*,
207 F.R.D. 9 (D.D.C. 2002) ............................................................................................. 16, 17

*Orloff v. Willoughby*,
345 U.S. 534 (1953) ................................................................................................................. 19

*Rostker v. Goldberg*,
453 U.S. 57 (1981) ............................................................................................................ 18, 19

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) ................................................................................................................... 10

*Simplex Time Recorder Co. v. Sec'y of Labor*,
766 F.2d 575 (D.C. Cir. 1985) ......................................................................... 11, 17, 25

*Singletary v. Sterling Transport Co.*,
289 F.R.D. 237 (E.D. Va. 2012) ............................................................................................ 10

*Sykes v. Brown*,
90 F.R.D. 77 (E.D. Pa. 1981) ................................................................................................. 14

*Thomasson v. Perry*,
80 F.3d 915 (4th Cir. 1996) .................................................................................................... 18

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ..................................................................................................... 18, 19

*United States v. Morgan*,
313 U.S. 409 (1941) ........................................................................................... 11, 12, 26

*United States v. Sensient Colors, Inc.*,
 649 F. Supp. 2d 309 (D.N.J. 2009) ................................................................. 12, 17

*United States v. Stanley*,
 483 U.S. 669 (1987) ........................................................................................ 19

*United States v. Wal-Mart Stores, Inc.*,
 No. CIV.A. PJM–01–CV–152, 2002 WL 562301 (D. Md. 2002) ........................... 15

*Va. Dep't of Corrections v Jordan*,
 921 F.3d 180 (4th Cir. 2019) .............................................................................. 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977) ........................................................................................ 12

*Walker v. NCNB Nat'l Bank of Fla.*,
 810 F. Supp. 11 (D.D.C. 1993) .......................................................................... 14

*Winter v. NRDC*,
 555 U.S. 7 (2008) ..................................................................................... 17, 19

**Statutes**

10 U.S.C. § 136 ................................................................................................ 12, 17

**Rules**

Fed. R. Civ. P. 26(b)(2)(C) ................................................................................. 10

Fed. R. Civ. P. 26(c) ........................................................................................... 10

Fed. R. Civ. P. 45 ......................................................................................... 10, 26

**Regulations**

32 C.F.R. § 66.6 ................................................................................................. 12

82 Fed. Reg. 41,319 ............................................................................................ 4

**Other Authorities**

Dep't of Defense Directive No. 5124.02 (June 23, 2008),
 https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/512402p.pdf ................ 17

Secretary of the Navy, Thomas P. Dee,
  https://www.secnav.navy.mil/donhr/About/Senior-Executives/Biographies/Dee,%20T.pdf .......
  ............................................................................................................................... 24

# INTRODUCTION

Pursuant to Rules 26(c)(1) and 45(d)(3) of the Federal Rules of Civil Procedure, Defendants in the above-captioned action move to quash a subpoena ordering Robert Wilkie Jr., the Secretary of Veterans Affairs, to appear for a deposition on May 27, 2020 in this District. *See* Notice of Subpoena ("Wilkie Subpoena"), attached hereto as Ex. A. Secretary Wilkie is not a party to the underlying action at issue here, *Karnoski v. Trump* (*Karnoski*), No. 2:17-cv-01297-MJP (W.D. Wash.), which challenges the Department of Defense's ("DoD") policy on military service by transgender individuals and individuals with a medical condition called gender dysphoria. Plaintiffs seek to depose the Secretary to probe his thought process and reasons for recommending the challenged policy when he held the position of Under Secretary of Defense for Personnel and Readiness. Under well-established law, this subpoena should be quashed. Notably, the Ninth Circuit has issued a prior writ of mandamus limiting discovery in *Karnoski*, which weighs heavily against granting the requested deposition, and that court is presently considering a second mandamus petition concerning the scope of remaining discovery, which would further weigh against granting the deposition.

Permitting Plaintiffs' request would conflict with long-standing precedent and would be especially unwarranted in a challenge to military personnel policy. Because the Secretary is a top Executive Branch official, the Secretary's deposition is entirely inconsistent with the "apex doctrine," which protects high-ranking officials from testifying about their official decisions. The deposition is also unnecessary. Defendants have already produced all relevant, non-privileged documents necessary to litigate Plaintiffs' claims, in addition to privileged documents pursuant to court orders, and have made available several other senior DoD and Armed Forces officials with

direct personal knowledge of the challenged policy's development. For these reasons set forth further below, the Court should quash the deposition subpoena for Secretary Wilkie.

## BACKGROUND

The underlying action, *Karnoski*, is one of four long-running cases challenging the constitutionality of DoD's policy concerning military service by transgender individuals and individuals with gender dysphoria. *See Stockman v. Trump*, No. 1:17-cv-6516 (C.D. Cal. Sept. 5, 2017); *Stone v. Trump*, No. 1:17-cv-02459 (D. Md. Aug. 28, 2017); *Doe v. Esper* (*Doe DC*), No. 17-cv-1597 (D.D.C. Aug. 9, 2017); *see also Doe v. Esper* (*Doe MA*), No. 1:20-cv-10530 (D. Mass. Mar. 17, 2020) (recent action for a preliminary injunction). All four cases are in discovery. The *Doe DC* Plaintiffs have also indicated their intent to depose Secretary Wilkie, and the other plaintiffs may follow suit. *See* Joint Status Report at 2, *Doe DC*, No. 17-cv-1597 (D.D.C. May 7, 2020), ECF 242.

### I.    DoD Policy Regarding Military Service by Transgender Individuals and Individuals with Gender Dysphoria

In February 2018, then-Secretary Mattis issued the current DoD policy regarding military service by transgender individuals and individuals with gender dysphoria. *Karnoski v. Trump*, 926 F.3d 1180, 1187–88 (9th Cir. 2019) (per curiam). For decades, the military had maintained a "categorical ban on retention of transgender service members" or their accession into—that is, their joining—the military. *Id.* The current policy permits transgender individuals to serve but presumptively disqualifies certain individuals based on a medical condition—gender dysphoria— and its treatment. As described below, the current policy, which is the product of comprehensive review by high-ranking military officials, came after several recent developments in the military's policy.

In June 2016, following a review of existing policy, then-Secretary of Defense Ashton Carter ordered the armed forces to revise their standards to permit military service by transgender individuals under certain circumstances, depending on whether an individual had been diagnosed with "gender dysphoria." Gender dysphoria is a psychological condition that "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, DSM-5 ("DSM-5") at 451, attached hereto as Ex. B. It involves "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Doe DC v. Shanahan*, 917 F.3d 694, 710–11 (D.C. Cir. 2019) (Williams, J., concurring in result) (describing the Carter policy). The policy disqualified those with a "history of gender dysphoria" or who had undergone "gender transition" from accessing into the military unless they could demonstrate that they had "been . . . stable for 18 months." *Doe DC*, 917 F.3d at 710. Transgender persons who had already completed "gender transition" as treatment for "gender dysphoria," and demonstrated stability over the required time, could access in their "preferred biological gender." *Id.* For retention purposes, "individuals who embarked on gender transition while serving could continue to serve provided that they met the standards associated with their biological sex until their transition was 'complete' (at which point, they could serve in their preferred gender)." *Id.* at 711.

On June 30, 2017, before the Carter policy's accession standards were set to take effect, then-Secretary Mattis decided, based on the recommendations of the Secretaries of the Military Departments and the Chiefs of the Military Services and in the exercise of his discretion, that it was "necessary to defer" the Carter accession standards until January 1, 2018, so that the military could "evaluate more carefully" the effect of accessions by transgender individuals "on readiness and lethality." Memorandum from Secretary Mattis to President Trump ("Mattis Mem.") (Feb.

22, 2018) at 1, attached hereto as Ex. C; *see also Doe DC*, 917 F.3d at 713 (Williams, J., concurring in result).

While this review was ongoing, the President stated on Twitter on July 26, 2017 that the military "will not accept or allow Transgender individuals to serve in any capacity." *Doe DC*, 917 F.3d at 698 (quotation marks omitted). He then issued a memorandum in August 2017 explaining that former Secretary Carter had "failed to identify a sufficient basis to conclude that terminating the Department's longstanding policy"—which generally disqualified transgender individuals from service—"would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." *Id.* (citation omitted). The President's 2017 memorandum reinstituted the military's longstanding policy disqualifying those individuals, but in doing so, made clear that the Secretary could "advise [the President] at any time, in writing, that a change to this policy is warranted." *See* Memorandum of August 25, 2017, 82 Fed. Reg. 41,319, 41,319 (Aug. 30, 2017).

Then-Secretary Mattis established a Panel of Experts (the "Panel") to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." DoD Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) ("DoD Report") at 17, attached hereto as Ex. D. The Panel consisted of "senior uniformed and civilian Defense Department and U.S. Coast Guard leaders." Mattis Mem. at 1. Then-Secretary Mattis designated the Under Secretary of Defense for Personnel and Readiness to chair the work of the Panel. *See* DoD Report at 18. At that time, Secretary Wilkie had not yet been appointed to that role, and so the Panel was chaired by Mr. Anthony Kurta, who was performing the duties of the Under Secretary of Defense for Personnel and Readiness at that time. Decl. of Lernes J. Hebert ("Hebert Decl.") ¶ 7, attached hereto as Ex. E. Mr. Kurta proceeded to chair the first seven of the Panel's meetings before Secretary Wilkie assumed his

duties as Under Secretary in late November 2017. *Id.* ¶ 10. After that point, Secretary Wilkie chaired the remaining six meetings of the Panel; however, he "played a limited role during the Panel's discussions and deliberations" because he had not been present for more than half of its meetings. *Id.* ¶ 11. At his first Panel meeting on November 30, 2017, Secretary Wilkie turned the meeting over to Mr. Hebert, apart from a brief introductory statement and closing remarks, and proceeded to do the same at each of the remaining five Panel meetings he attended. *Id.* He also announced at the November 30 meeting that he would remain a non-voting member of the Panel for its duration. *Id.* From that point forward, Mr. Hebert assumed the "role as facilitator," and Mr. Kurta took on the role of Special Assistant to Mr. Wilkie and an advisory role on the Panel. *Id.* ¶ 10.

Over the course of thirteen meetings over ninety days, the Panel met with commanders of transgender service members, military medical professionals, civilian medical professionals, and transgender service members. *See Karnoski*, 926 F.3d at 1191. The Panel reviewed information regarding gender dysphoria and its treatment, as well as data collected after the announcement of the Carter policy. *Id.* The Panel further received briefings from three "working groups" dedicated to specific issues involving personnel, medical treatment, and military lethality. DoD Report at 18.

The Panel ultimately developed a new policy, *see* DoD Report at 32, which then-Secretary Mattis adopted in full and which is now in effect, *see id.* at 4 (confirming that the DoD's policy is "[c]onsistent with [the Panel's] recommendations"). Because the Under Secretary had been appointed to chair the Panel, Secretary Wilkie participated in the presentation of the Panel's recommendations to then-Secretary Mattis, along with Mr. Kurta and Mr. Hebert, and signed the two-page formal memorandum to then-Secretary Mattis memorializing the Panel's agreed-upon

recommendations. Hebert Decl. ¶ 15; *see also* Memorandum from R. Wilkie to Secretary of Defense re Recommendations by the Transgender Review Panel of Experts, attached hereto as Ex. F.

Like the Carter policy before it, the Department's current policy turns on the medical condition of gender dysphoria, and its attendant psychological conditions, not on transgender status. Under each policy, transgender individuals without a history or diagnosis of gender dysphoria may serve if they meet the standards associated with their biological sex, whereas those with gender dysphoria are presumptively disqualified. *Id.* at 4–6. The main difference between the two policies is the nature of the exceptions to that presumptive disqualification. Under the current policy, individuals with a history or diagnosis of gender dysphoria may join or remain in the military if they have neither undergone gender transition nor seek to do so. *Id.* at 5. In addition, for accession into the military, such individual must show 36 months of stability (as opposed to 18 months of stability under the Carter policy) before applying, while for retention in the military, they may remain if they meet deployability standards. *Id.* By contrast, those with gender dysphoria who have undergone gender transition or seek to do so are disqualified, absent a waiver. *Id.*

Recognizing, however, that a number of individuals with gender dysphoria had "entered or remained in service following the announcement of the Carter policy," the Department included a reliance exemption in its 2018 policy. DoD Report at 43. Specifically, the exemption provides that service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment" as well as "serve in their preferred gender, even after the new policy commences." *Id.*

Then-Secretary Mattis conveyed the Panel's proposed policy to the President in a memorandum dated February 22, 2018 that was accompanied by DoD's Report detailing the bases for the proposal. *See* Mattis Mem. The DoD Report had been prepared by a Personnel and Readiness team that was formed by Mr. Hebert, Mr. Kurta, and Secretary Wilkie at the conclusion of the Panel process, Hebert Decl. ¶ 16, and memorialized the Panel's agreed-upon recommendations, *see* DoD Report at 17-18. Then-Secretary Mattis stated that the policy that the Panel developed was also consistent with his "professional judgment." Mattis Mem. at 2. The Secretary requested that the President "revoke" his 2017 memorandum to permit the military to adopt the new approach. *Id.* at 1. On March 23, 2018, the President revoked the 2017 memorandum, permitting the current policy to go into effect. On March 28, 2018, less than a week after the President approved DoD's policy recommendations, then-Under Secretary Wilkie was named Acting Secretary of Veterans Affairs. On March 30, 2018, he left the DoD after serving as Under Secretary of Defense for Personnel and Readiness for approximately four and a half months and had no further involvement related to the Policy. Hebert Decl. ¶ 17.

## II.      Underlying Litigation

Plaintiffs filed this action in August 2017 to challenge the President's 2017 Twitter announcement and 2017 memorandum. *See* Compl. for Decl. & Inj. Relief, *Karnoski*, No. 2:17-cv-01297-MJP (W.D. Wash.), ECF 1.[1] The district court preliminarily enjoined the directives in the memorandum. Order (Dec. 11, 2017), ECF 103. In April 2018, after the President revoked the directives, the *Karnoski* district court extended the injunction to DoD's current policy, stating that it "threaten[s] the very same violations." Order (Apr. 13, 2018) at 12, ECF 233.

---

[1] Unless otherwise indicated, all citations to the docket refer to the underlying action, *Karnoski v. Trump*, No. 2:17-cv-01297-MJP (W.D. Wash.).

Plaintiffs served broad discovery requests that sought, *inter alia*, "all documents and communications" relating to the military's deliberations on service by transgender individuals. *See* Pls.' First Set of Requests for Production of Documents to Defs. (Dec. 29, 2017) at 1, 4, ECF 246-2; Pls.' Second Set of Requests for Production of Documents to Defs. (Apr. 26, 2018) at 2–3, ECF 269-2. The Government initially submitted a partially redacted Administrative Record and produced approximately 30,000 non-privileged documents, while withholding thousands of documents protected by the deliberative process privilege. In July 2018, the district court then compelled the production of all of those documents withheld under the deliberative process privilege. Order (Jul. 27, 2018), ECF 299. In the Ninth Circuit, the Government challenged both the preliminary injunction and the discovery order.

The Ninth Circuit vacated the preliminary injunction, holding that DoD's 2018 policy "is significantly different" from the President's 2017 memorandum barring transgender individuals from serving "in both its creation and its specific provisions." *Karnoski*, 926 F.3d at 1199. It also issued a writ of mandamus vacating the district court's discovery order. *Id.* at 1203–08. The Ninth Circuit directed "careful consideration [of] executive branch privileges," concluding that "the military's interest in full and frank communication about policymaking raises serious—although not insurmountable—national defense interests." *Id.* at 1206.

Separately, in September 2019, the district court for the District of Columbia, in the related *Doe DC* litigation, concluded that the *Doe DC* plaintiffs had overcome the deliberative process privilege for documents that were used or considered by the Panel in developing DoD's current policy. *See Doe DC v. Esper*, No. 17-1597, 2019 WL 4394842, at *8–10 (D.D.C. Sept. 13, 2019). Though the Government disagreed with that order, Defendants produced an unredacted version of the Administrative Record, unredacted meeting minutes from the Panel, and all deliberative

documents and communications to, from, generated by, presented to, or reviewed by the Panel. Defs.' Notice at 1, ECF 389. That production was shared with the Plaintiffs in this action. *See* Easton Decl. ¶ 6, ECF 405-2; Stipulated Uniform Protective Order and Cross-Use Agreement, ECF 183.

Notwithstanding the above production and the Ninth Circuit's writ of mandamus, the district court in this action again ordered Defendants to produce thousands of additional documents that were never seen or considered by the Panel that developed the current policy and also ordered that witnesses at depositions must provide information protected by the deliberative process privilege. *See* Order (Dec. 18, 2019), ECF 401; Minute Entry (Feb. 3, 2020), ECF 410; Order (Feb. 7, 2020), ECF 413. Those orders are currently the subject of another pending mandamus petition before the Ninth Circuit, which has issued an administrative stay of the district court's orders in this action. *See* Order, *In re Trump*, No. 20-70365 (9th Cir. Feb. 12, 2020), ECF 415.

On May 6, 2020, Plaintiffs served Secretary Wilkie with a third-party subpoena pursuant to Rule 45 seeking his deposition testimony on May 27, 2020 in Alexandria, Virginia. *See* Wilkie Subpoena. Pursuant to Local Rule 37(E), counsel for all parties met and conferred telephonically on May 11, 2020 in a good faith effort to resolve this dispute, but were unable to do so. During the May 11, 2020 meet-and-confer, counsel for Plaintiffs and Plaintiff-Intervenor did agree, however, to stay the compliance date of the subpoena pending this Court's resolution of the instant motion to quash. The parties have also corresponded in writing regarding this issue.[2]

---

[2] On April 10, 2020, defense counsel informed counsel for Plaintiffs and Plaintiff-Intervenor that the Government opposes Plaintiffs' requested deposition of Secretary Wilkie, and that if Plaintiffs nevertheless seek to depose him, they must serve him with a third-party subpoena under Rule 45. Plaintiffs elected to proceed with the subpoena, and requested that the Government accept service on behalf of Secretary Wilkie, to which the Government agreed. On April 24, 2020, the Government requested that Plaintiffs provide the topics on which they intend to depose Secretary Wilkie. To date, Plaintiffs have not responded to this request.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs subpoenas issued to non-parties.  *See* Fed. R. Civ. P. 45.  Under Rule 45, the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies."  Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv).  Because the scope of discovery under Rule 45 tracks Rule 26, courts adjudicate motions to quash by reference to the standards for discovery under both rules.  *See Singletary v. Sterling Transport Co.*, 289 F.R.D. 237, 240–41 (E.D. Va. 2012).  Rule 26 grants trial courts broad discretion to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including to forbid the proposed discovery altogether.  Fed. R. Civ. P. 26(c); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).  Under Rule 26(b)(2), in particular, the court "must limit the frequency or extent of discovery . . . if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C).  Although the party moving to quash ordinarily bears the burden of persuasion, *Va. Dep't of Corrections v Jordan*, 921 F.3d 180, 189 (4th Cir. 2019), where, as discussed below, the subpoena is issued to a high-ranking government official, courts require the party seeking to depose the official to demonstrate that "extraordinary circumstances" justify the deposition.  *See In re McCarthy*, 636 F. App'x 142, 143 (4th Cir. 2015); *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-cv-525, 2014 WL 12544827, at *2 (E.D. Va. Jan. 9, 2014).

**ARGUMENT**

I.    **The Deposition of a Sitting Cabinet Secretary Should Not Be Ordered Absent Extraordinary Circumstances.**

    A.    **High-Ranking Officials Are Generally Protected from Testifying About Their Official Decisions.**

Since the Supreme Court's decision in *United States v. Morgan*, 313 U.S. 409 (1941), courts have routinely held under the "apex doctrine" that high-ranking government officials should not—absent exceptional circumstances—be deposed or called to testify regarding their reasons for taking official action. *See, e.g.*, *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203–04 (2d Cir. 2013); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586–87 (D.C. Cir. 1985). In *Morgan*, the Supreme Court countermanded the district court's order permitting the deposition of the Secretary of Agriculture on his process in reaching an official decision, admonishing that he "should have never been subjected to this examination" because it was improper "to probe [his] mental processes." 313 U.S. at 421–22.

Consistent with *Morgan*, the Fourth Circuit and other courts of appeals have issued the extraordinary remedy of a writ of mandamus to preclude the depositions of high-ranking Executive branch officials. *See, e.g.*, *In re McCarthy*, 636 F. App'x at 145 (EPA Administrator); *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 875 (7th Cir. 2019) (CFTC chairman, commissioners, and staff); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (Vice President's Chief of Staff); *In re United States ("Holder")*, 197 F.3d 310, 316 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055, 1063 (5th Cir. 1995) (members of the Board of Directors of the Federal Deposit Insurance Corporation); *In re United States ("Kessler")*, 985 F.2d 510, 513 (11th Cir. 1993) (per curiam) (FDA Commissioner). Numerous courts have upheld these protections, even after the official has left office. *See, e.g.*, *FDIC v.*

*Galan-Alvarez*, No. 1:15-mc-00752, 2015 WL 5602342, at *4–5 (D.D.C. Sept. 4, 2015) (former

FDIC chairperson and senior deputy director); *United States v. Sensient Colors, Inc.*, 649 F. Supp.

2d 309, 316–18 (D.N.J. 2009) (former EPA Administrator); *Croddy v. FBI*, No. 00-cv-0651, 2005

WL 8168910, at *1 (D.D.C. Mar. 30, 2005) (former FBI director).   Three separate rationales

underlie the apex doctrine.

     *First*, constitutional separation-of-powers principles are implicated when parties litigating

against federal agencies attempt to ascertain the thoughts and mental processes by which high-

ranking agency officials exercise their official discretion.   *See Morgan*, 313 U.S. at 422 ("Just as

a judge cannot be subjected to such a scrutiny, . . . so the integrity of the administrative process

must be equally respected." (citations omitted)); *Vill. of Arlington Heights v. Metro. Hous. Dev.

Corp.*, 429 U.S. 252, 268 n.18 (1977) ("[J]udicial inquiries into . . . executive motivation represent

a substantial intrusion into the workings of other branches of government.").   Challenges to agency

policies are ordinarily resolved based on the "administrative findings that were made at the same

time as the decision"—as reflected in the Administrative Record that Defendants produced in this

action.   *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).   The Supreme

Court has repeatedly confirmed that, absent "a strong showing of bad faith or improper behavior,"

discovery into "the mental processes of administrative decisionmakers" is unwarranted.[3]   *Dep't of

Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (citation omitted); *see also In re Dep't

of Commerce*, 139 S. Ct. 16 (2018) (staying the district court's order authorizing the deposition of

---

[3] The separation of powers concerns in this particular case are further implicated by the fact that
the Under Secretary of Defense for Personnel and Readiness (subject to the authority, direction,
and control of the Secretary of Defense) has been delegated specific authority from Congress to
set physical and medical standards for military service.   *See* 10 U.S.C. § 136; *see also* 32 C.F.R.
§ 66.6.   Adherence to the apex doctrine to avoid probing the mental process of a former Under
Secretary of Defense (and current Secretary of Veterans Affairs) in this area thus serves also to
protect the interests of both political branches in policy oversight.

the Secretary of Commerce about his decision-making); *Dep't of Commerce*, 139 S. Ct. at 2574 (concluding that "the new material that the parties stipulated should have been part of the administrative record . . . largely justified such extra-record discovery as occurred (*which did not include the deposition of the Secretary himself*)" (emphasis added)).

*Second*, subjecting high-level government officials to depositions in civil actions involving their agency would impede the exercise of official duties. *See Lederman*, 731 F.3d at 203 (noting that, "if courts did not limit these depositions, such officials would spend 'an inordinate amount of time tending to pending litigation'" (quoting *Bogan*, 489 F.3d at 423)); *Kessler*, 985 F.2d at 512 ("High ranking government officials have greater duties and time constraints than other witnesses."). As one court explained:

> [P]ublic policy requires that the time and energies of public officials be conserved for the public's business to as great an extent as may be consistent with the ends of justice in particular cases. Considering the volume of litigation to which the government is a party, a failure to place reasonable limits upon private litigants' access to responsible governmental officials as sources of routine pre-trial discovery would result in a severe disruption of the government's primary function.

*Cmty. Fed. Savings & Loan v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983).

The concern for disruption is particularly salient where, as here, Plaintiffs seek to depose a sitting Cabinet Secretary. As set forth in the declaration of Pamela J. Powers, the current Acting Deputy Department of Veterans Affairs ("VA") Secretary and Secretary Wilkie's Chief of Staff until April 1, 2020, preparing for and sitting for a deposition would "substantially interfere" with the Secretary's "exercise of his official duties." *See* Decl. of Pamela J. Powers ¶ 13, attached hereto as Ex. G. As the head of the federal government's second largest department, Secretary Wilkie is responsible for administering the largest integrated health network in the United States, with nine million enrolled veterans, in addition to overseeing the Veterans Benefits

Administration, the National Cemetery Administration, and VA's efforts to support the nation's preparedness for war, natural disasters, and other emergencies. *See id.* ¶ 8. As a member of the President's Cabinet, moreover, the Secretary must be "prepared to advise the President on any issues related to the VA that may arise at any time." *Id.* ¶ 10. On any given day, the Secretary may be called upon to attend "as many as eleven individual meetings with VA officials, external officials, and other stakeholders," many of which require "advance internal VA meetings to review the material to be discussed." *Id.* ¶ 9. The Secretary's duties also include site visits to VA facilities and medical centers across the country. *Id.*

Moreover, the "demands on Secretary Wilkie's time have increased even further since the start of the global COVID-19 pandemic." *Id.* ¶ 11. Since March 2, 2020, Secretary Wilkie has served as a member of the White House Coronavirus Task Force, and, in that capacity, "has been occupied on a daily basis with a number of pressing tasks, such as "participating in Task Force meetings, leading senior departmental leader meetings, conducting calls with state governors to offer personnel and guidance to states in need, conducting weekly conference calls with Congress and Veterans Service Organizations on VA's current COVID-19 efforts, participating in multiple daily media interviews, [and] responding to requests from the White House." *Id.* Given these responsibilities and the demands they impose on the Secretary's time and resources, Defendants have consistently opposed Plaintiffs' attempts to depose Secretary Wilkie.

Aside from imposing on high-ranking officials' time, intrusive discovery also exerts a chilling effect on their decision-making. Courts have recognized that "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options, no matter how controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also*

*Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981) ("Should the agency head be subject to deposition in every resulting case and be repeatedly required to explain the various mental steps he took to reach his decision, the decision may be his last."). These concerns are heightened when a party requests to depose a high-ranking official about military affairs, particularly those policies affecting national security. *Cf. Karnoski*, 926 F.3d at 1206 (per curiam) (noting that "the military's interest in full and frank communication about policymaking raises serious—although not insurmountable—national defense interest.").

*Third*, "a contrary rule might discourage otherwise upstanding individuals from public service." *Galan-Alvarez*, 2015 WL 5602342, at *4 (citation omitted). As multiple courts have recognized, absent limits on the depositions of high-ranking officials, there is "a tremendous potential for abuse or harassment." *K.C.R. v. Cty. of Los Angeles*, No. CV 13-3806, 2014 WL 3434257, at *3 (C.D. Cal. July 11, 2014) (quotation omitted); *see In re Stone*, 986 F.2d 898, 904 (5th Cir. 1993); *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM–01–CV–152, 2002 WL 562301, at *4 (D. Md. 2002).

## B. That Plaintiffs Seek Secretary Wilkie's Testimony Regarding His Former Role Does Not Change This Presumption.

The apex doctrine applies no less to Secretary Wilkie simply because Plaintiffs seek his testimony regarding his official actions while he served as the Under Secretary of Defense for Personnel and Readiness. Courts have recognized that "[t]he integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position." *Galan-Alvarez*, 2015 WL 5602342, at *3; *see also Wal-Mart Stores, Inc.*, 2002 WL 562301, at *3–4. Secretary Wilkie's appointment to a higher-ranking position does not change the apex analysis. The concerns

motivating the apex doctrine did not arbitrarily dissipate the moment Secretary Wilkie left his position as an Under Secretary at DoD to become the Secretary of VA.

In any event, should the Court consider only Secretary Wilkie's former position as the Under Secretary of Defense for Personnel and Readiness when applying the apex doctrine, the presumption against allowing his deposition would still stand. "Although no standard has been established for determining if an official is high-ranking," *Byrd v. District of Columbia*, 259 F.R.D. 1, 6 (D.D.C. 2009), the Under Secretary of Defense for Personnel and Readiness falls well within the confines of the apex doctrine. In conducting the apex analysis, courts have considered, among other things, the official's title, place in the governmental hierarchy, and job responsibilities. *See, e.g.*, *Alexander v. FBI*, 186 F.R.D. 1, 3–4 (D.D.C. 1998) (determining that three officials classified as "Assistant[s] to the President" qualified as high-ranking officials upon consideration of "the nature of their positions at the White House"); *Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002) (concluding that the EPA's Deputy Chief of Staff is a high-ranking official upon finding that, "[a]s a member of the Senior Executive Service with responsibility for budget, personnel, and resource issues, it is clear that [the Deputy Chief of Staff] is in a position of substantial authority").

The position of Under Secretary of Defense for Personnel and Readiness entails the exercise of substantial responsibilities. The Under Secretary is responsible for "serv[ing] as the senior policy advisor to the Secretary of Defense on all aspects of Total Force Management . . . for over two million uniformed personnel and nearly 750,000 DoD civilians." Hebert Decl. ¶ 7. The position also entails substantial authority. The Under Secretary represents the Secretary of Defense "on manpower and personnel matters outside of the Department" and "overs[ees] the overall state of military readiness, . . . health affairs, training, and other personnel requirements and management," including "overseeing the administration" of programs such as the "$15 billion

Defense Health Program." *Id.* ¶ 8; *see also* 10 U.S.C. § 136(b) & (d) (granting the Under Secretary responsibility "in the areas of military readiness, total force management, military and civilian personnel requirements [and] training, . . . National Guard and reserve components, and health affairs" and for "the monitoring of the operations tempo and personnel tempo of the armed forces"); DoD Directive 5124.02 (June 23, 2008), https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/512402p.pdf (last visited May 20, 2020). Given the stature and those job responsibilities, the Under Secretary of Defense for Personnel and Readiness independently qualifies as a former high-ranking Government official whose deposition should only be allowed upon a showing of extraordinary circumstances.[4] Accordingly, Plaintiffs must overcome a high presumption in order to obtain Secretary Wilkie's deposition in this case, not only because he is a sitting Cabinet Secretary, but also in recognition of his senior DoD role as the Under Secretary of Defense for Personnel and Readiness.

## II.  Secretary Wilkie's Deposition Is Especially Inappropriate in This Case in Light of the Deference Owed by Courts to Military Judgments.

The foregoing concerns with the deposition of high-ranking officials are particularly acute in this case, where Plaintiffs seek to question and second-guess a former senior DoD official (and current Cabinet Secretary) about his decisions affecting deliberations regarding military personnel policy. As one of the "'complex, subtle, and professional decisions as to the composition . . . of a military force,' which are 'essentially professional military judgments,'" DoD's current policy is subject to a highly deferential form of review. *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation

---

[4]  Indeed, courts have extended the apex doctrine to preclude the depositions of officials (both current and former) of lower rank. *See, e.g.*, *Simplex Time Recorder Co.*, 766 F.2d at 586–87 (Regional Administrator of OSHA); *Sensient Colors, Inc.*, 649 F. Supp. 2d at 321 (former EPA Regional Administrator); *Low*, 207 F.R.D. at 12 (EPA Deputy Chief of Staff).

omitted). Choices about who should serve "are based on judgments concerning military operations and needs, and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well." *Rostker v. Goldberg*, 453 U.S. 57, 68 (1981) (citation omitted). "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (internal citations and alterations omitted); *see also Thomasson v. Perry*, 80 F.3d 915, 926 (4th Cir. 1996) ("Parallel to the deference owed Congressional and Presidential policies is deference to the decision-making authority of military personnel who 'have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy'" (quoting *Weinberger*, 475 U.S. at 508)). The judicial inquiry into challenges to military policy is thus "highly constrained," even when evaluating a "'categorical' . . . classification that discriminate[s] on the basis of sex," *Trump v. Hawaii*, 138 S. Ct. 2392, 2419–20 (2018) (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)), or challenges under the First Amendment, *see Weinberger*, 475 U.S. at 507–08.

Even testimony that "contradict[s]" the reasons behind a military policy would be "quite beside the point," as long the policy had been "decided by the appropriate military officials" in "their considered professional judgment." *Id.* at 509. And when such discovery has occurred, the Supreme Court has "chastised the district court" for "palpably exceed[ing] its authority" in "relying on [such] testimony." *Doe DC*, 917 F.3d at 737 (Williams, J., concurring in result) (first quoting *Weinberger*, 475 U.S. at 509, then quoting *Rostker*, 453 U.S. at 81).

The rationale for the apex doctrine thus applies with particular force in the military setting. *First*, the Supreme Court has recognized that "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Rostker*, 453 U.S. at 71 (quoting *Orloff v. Willoughby*, 345 U.S. 534, 540 (1953)); *see also Doe DC*, 917 F.3d at 732 (Williams, J., concurring in result) (noting, in the *Doe DC* case challenging this same policy, that, "when it comes to 'collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked'" (quoting *Hawaii*, 138 S. Ct. at 2419)); *cf. Lebron v. Rumsfeld*, 670 F.3d 540, 553 (4th Cir. 2012) (noting that the "Supreme Court has cautioned against entertaining suits that could be so 'problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands.'" (quoting *United States v. Stanley*, 483 U.S. 669, 683 (1987))). *Second*, as the Ninth Circuit has recognized in the underlying case, there is a substantial risk of a chilling effect, as "the military's interest in full and frank communication about policymaking raises serious . . . national defense interests." *Karnoski*, 926 F.3d at 1206. *Third*, there is no question that deterring military officials from public service by subjecting them individually to the burdens of civil litigation is an especially grave concern, where the nation relies on capable officials "to fight or be ready to fight wars should the occasion arise." *Rostker*, 453 U.S. at 70 (citation omitted). There is no proper basis here for deposing a former top DoD official (and current Cabinet Secretary) to probe his role in setting a policy regarding the "composition . . . of a military force." *Winter*, 555 U.S. at 24 (citing *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

### III.  Plaintiffs Cannot Establish that Exceptional Circumstances Require Secretary Wilkie's Deposition.

Plaintiffs cannot overcome these hurdles in seeking to depose a sitting Cabinet Secretary about his deliberations regarding a military policy.  Compelling the testimony of Secretary Wilkie would result in "serious repercussions for the relationship between two coequal branches of government."  *In re United States ("Jackson")*, 624 F.3d 1368, 1372 (11th Cir. 2010) (noting that "the threat to the separation of powers is more substantial" when the official is "higher-ranking").  To demonstrate extraordinary circumstances warranting Secretary Wilkie's deposition, Plaintiffs must, at minimum, demonstrate that the Secretary has additional non-privileged knowledge relevant to the underlying challenge, and that the information cannot be obtained elsewhere.  *See Lederman*, 731 F.3d at 204; *Microsoft*, 2014 WL 12544827, at *2.  Plaintiffs have not specified why they wish to depose Secretary Wilkie, but instead broadly assert that his testimony is "critically important" because he was "one of two military officials who chaired the Panel" and "one of the lead authors of the February 2018 Report."  *See* Joint Status Report ("JSR") at 4, attached hereto as Ex. H.  That is plainly insufficient, and the subpoena should be quashed for this reason alone.

#### A.  Plaintiffs Cannot Demonstrate That the Secretary Has Unique Information Relevant to Their Claims.

Plaintiffs' principal theory on their underlying claims in this action has been that DoD's current policy merely provided "after-the-fact justification" for the President's initial Tweet and memorandum, *see* Pls.' Second Am. Compl. ¶¶ 205–07, ECF 347.  But the Ninth Circuit has already rejected that theory, holding that the current policy "is significantly different" from the President's 2017 memorandum barring transgender individuals from serving "in both its creation and its specific provisions."  *Karnoski*, 926 F.3d at 1199.  The D.C. Circuit similarly found that "[i]t was clear error to say there was no significant change with respect to at least two aspects of

the policy recommended by Secretary of Defense James Mattis in February 2018 and approved by the President in March 2018." *Doe 2 v. Shanahan*, 755 F. App'x 19, 23 (D.C. Cir. 2019) (per curiam). Plaintiffs thus can challenge the current policy only on its own terms. There is no basis to depose Secretary Wilkie because all relevant, non-privileged information that he possesses can be (and has been) obtained from other sources.

*First*, Plaintiffs are mistaken in their assumptions about Secretary Wilkie's role in formulating the disputed policy and the uniqueness of any information he may possess. The assertion that Secretary Wilkie was one of two DoD officials who chaired Panel meetings and was one of the lead authors of the February 2018 Report to then-Secretary Mattis is inadequate on its face to justify his deposition.

To begin, the notion that because the Secretary was one of two officials who was formally named to chair the Panel meetings, he would have unique information about the process by which the Panel recommended the disputed policy is far too generalized and speculative to meet Plaintiffs' heavy burden of showing that the Secretary has unique information that cannot be obtained from other sources. *See Galan-Alvarez*, 2015 WL 5602342, at *5 (finding that the defendants' generalized assertions that the FDIC Chairperson "may have attended meetings and requested briefings and documents on Project Themis due to her leadership role" failed to "demonstrate that any knowledge she gained of the project was unique"); *In re United States*, 542 F. App'x 944, 949 (Fed. Cir. 2013) (refusing to permit the deposition of the Chairman of the Board of Governors for the Federal Reserve because the information sought by the plaintiff essentially amounted to a "fishing expedition").

In addition, Plaintiffs' assertion also underscores their fundamental misunderstanding of the process by which DoD developed its current policy concerning military service by transgender

individuals and gender dysphoria. In fact, Secretary Wilkie was not even appointed and confirmed to his role as Under Secretary for Personnel and Readiness until more than halfway through the Panel process; he therefore took a non-voting role on the Panel. Hebert Decl. ¶ 11. Moreover, although Secretary Wilkie signed the transmittal memorandum of the Panel's recommendations to the Secretary of Defense and briefed then-Secretary Mattis on the Panel findings along with Mr. Kurta, Mr. Hebert, and others, that memo and the DoD Report merely memorialized the Panel's agreed-upon recommendations, which were adopted by Secretary Mattis. In light of the above, Plaintiffs simply cannot show that the Secretary will have any unique, non-privileged information.

*Second*, Plaintiffs have not established that they are unable to obtain the non-privileged information they seek from the Secretary through other means of discovery or from other witnesses. *See In re Cheney*, 544 F.3d at 314. For starters, Defendants have produced an unredacted Administrative Record in addition to over 30,000 non-privileged documents in this case. Defendants have also produced every deliberative document sent from, received by, generated by, presented to, or considered by the Panel that formulated DoD's current policy. These include:

- Unredacted meeting minutes from the Panel;

- All documents, testimony, and data reviewed by members of the Panel and the Panel's deliberations about these materials; and

- All documents and communications related to the Panel's work that were sent from, received by, generated by, presented to, or considered by the members of the Panel.

*See* Defs.' Notice at 2–3, ECF 389; *Doe DC*, 2019 WL 4394842, at *8–10. Defendants have also waived the deliberative process privilege over and produced the final versions of the presentations that were given to the Deputy Secretary of Defense, the Vice Chairman of the Joint Chiefs of Staff, and Secretary Mattis regarding the Panel's recommendations. *See* Decl. of Andrew E. Carmichael

¶ 2, ECF 381 at 2–3.  Accordingly, Plaintiffs already have access to all of the relevant documents

necessary to litigate their claim that the policy is "not supported by any compelling, important, or

even rational government interest," Pls. Second Am. Compl. ¶ 205, ECF 347, especially in light

of the principles of military deference.  Plaintiffs possess not only the Panel's deliberations, but

also the information that the Panel presented to Secretary Mattis, and the Secretary's reasons for

adopting the Panel's recommendations in full, *see* Mattis Mem; DoD Report.

   Moreover, Defendants have offered several other senior DoD and armed services officials

as witnesses who possess substantially similar or superior expertise and information regarding the

development of the challenged policy.  Most importantly, these include Anthony M. Kurta.  In the

fall of 2017, Mr. Kurta performed the duties of the Under Secretary of Defense for Personnel and

Readiness before Secretary Wilkie was appointed, and, in that role, served as chair of the Panel

until late November 2017; thereafter, unlike Secretary Wilkie, Mr. Kurta remained a voting

member of the Panel.  ECF 504-6 at 1.  Defendants have identified Mr. Kurta as the official who

presented the Panel's recommendations to the Deputy Secretary of Defense and Vice Chairman of

the Joint Chiefs of Staff.  ECF 504-5 at 12.  Mr. Kurta acted as the Chair of the Panel for its first

seven meetings and, as the Special Assistant to Secretary Wilkie, remained an advisor for the

remaining six.  *See* ECF 504-5 at 12; Hebert Decl. ¶ 10.  Plaintiffs have indicated their intent to

depose Mr. Kurta later this summer, which Defendants do not oppose.  *See* ECF 504-5 at 12.

   In addition, Plaintiffs have indicated they will be deposing Lernes J. Hebert, currently the

Deputy Assistant Secretary of Defense for Military Personnel Policy, this summer.  *See* ECF 504-

5 at 12.  Mr. Hebert is available to be deposed in this matter and has offered a declaration in support

of this Motion.  *See* Hebert Decl.  As noted in Mr. Hebert's declaration, he attended Panel meetings

and co-chaired the Medical Personnel Executive Steering Committee, which supported the Panel's

work.  ECF 504-6 at 2.  Mr. Hebert also attests that he facilitated the Panel's deliberations at each of the meetings Secretary Wilkie chaired, and that, apart from giving opening and closing remarks, Secretary Wilkie turned the balance of the Panel meetings over to Mr. Hebert.  Hebert Decl. ¶ 11. Defendants have identified Mr. Hebert as the official who directly supported Mr. Kurta in his briefing to the Deputy Secretary of Defense and Vice Chairman of the Joint Chiefs of Staff on the Panel's findings.  ECF 504-5 at 12.[5]

Given their personal and hands-on involvement with the Panel, these officials can provide non-privileged testimony—and, indeed, are better-situated—to answer questions Plaintiffs may have about the Panel's actions, and discuss information the Panel considered in formulating its recommendations, which then-Secretary Mattis adopted in full.  At a minimum, the Court should require Plaintiffs to complete their depositions of Mr. Kurta, Mr. Hebert, Mr. Dee, Dr. Adirim, and Ms. Miller *before* requesting to depose Secretary Wilkie.  *See, e.g.*, *Bogan*, 489 F.3d at 424 (holding it was "incumbent on [plaintiff] to seek information from [other officials] before turning to the Mayor").

In light of the above, Plaintiffs' proposed deposition of Secretary Wilkie is plainly unnecessary, and indeed, inappropriate.  Courts have made clear that "other less burdensome

---

[5]  Defendants have provided dates for the depositions of three additional officials.  ECF 503 at 12. Mr. Thomas Dee was performing the duties of the Under Secretary of the Navy at the time the disputed policy was approved, *see* Thomas P. Dee, https://www.secnav.navy.mil/donhr/About/Senior-Executives/Biographies/Dee,%20T.pdf (last visited May 19, 2020), and served as a voting member of the Panel, ECF 503 at 12.  Ms. Stephanie Miller and Dr. Terry Adirim both attended Panel meetings.  ECF 503 at 12.  Ms. Miller was co-chair of the Transgender Action Officer Action Working Group and chair of the Transgender Personnel Policy Working Group, and Dr. Adirim was co-chair of the Medical Personnel Executive Steering Committee with Mr. Hebert.  ECF 504-6 at 2. In addition, plaintiffs in the related *Doe DC* case have already deposed representatives from the Air Force and the Army who attended Panel meetings, and Defendants are making those individuals available for a second deposition in this case.

avenues for obtaining the information" must be "exhausted" before authorizing the deposition of a high-ranking official. *Microsoft*, 2014 WL 12544827, at *2 (citation omitted); *see also Simplex*, 766 F.2d at 587 (no extraordinary circumstances exist where party failed to show information was unavailable "from published reports and available agency documents"). Courts have, moreover, refused to authorize depositions or live testimony of high-ranking officials—both current and former—if "other persons can provide the information sought." *In re Holder*, 197 F.3d at 314; *see also In re Jackson*, 624 F.3d at 1373 (granting writ of mandamus directing the district court to allow the EPA to substitute the Assistant Administrator for the EPA Administrator at a court hearing); *Galan-Alvarez*, 2015 WL 5602342, at *5 (granting motion to quash subpoena seeking testimony from the FDIC Chairperson upon finding that, among other things, the FDIC had "made available four other officials, all of whom had greater involvement in the day-to-day progress of the bank's closure").

The Court should do the same here. Not only have Plaintiffs already received all of the relevant, non-privileged documents necessary to litigate their claims, they have also obtained the deliberative material from the Panel that then-Secretary Mattis tasked with formulating the challenged policy. Further, Plaintiffs have indicated that they will be taking Mr. Kurta's and Mr. Hebert's deposition later this summer, *see* JSR at 6–7, and scheduled dates for the depositions of several other DoD officials who were involved in the Panel's work, ECF 503 at 12. Plaintiffs can offer no reason, then, why the deposition of Secretary Wilkie is necessary.

### B. The Information Plaintiffs Seek from Secretary Wilkie is Protected or Privileged.

Finally, to the extent Plaintiffs seek to depose Secretary Wilkie about his thought process regarding the Panel's recommended policy, his participation in the process, or any communications that he had with then-Secretary Mattis regarding the policy or process, the Court

should quash the subpoena because that information is clearly protected or privileged.  *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).

Plaintiffs suggest that Secretary Wilkie's deposition is necessary to probe his thought process behind the ultimate policy proposal because he was "one of the lead authors of the February 2018 Report."  JSR at 4.  But even if the Secretary has unique, relevant information, discovery into his mental impressions is squarely foreclosed by the apex doctrine.  *See supra* at 11-12; *see also Morgan*, 313 U.S. at 421 ("We have explicitly held in this very litigation that 'it was not the function of the court to probe the mental processes of the Secretary.'" (citation omitted)); *Franklin Savings Ass'n*, 922 F.2d at 211 ("[A]bsent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.'" (quoting *Morgan*, 313 U.S. at 421–22)).  Plaintiffs have no basis to overcome those protections here.[6]

Moreover, any information that Plaintiffs seek regarding deliberations outside of the Panel's development of the policy is protected by the deliberative process privilege, and Plaintiffs have no basis to overcome that privilege here.  *See Cipollone v. Liggett Group, Inc.*, 812 F.2d 1400 (table) (4th Cir. 1987) (per curiam).  As the *Doe DC* district court explained, the request for deliberative documents without any connection to Panel members is an improper "fishing" expedition.  Tr. of Telephone Conference, *Doe DC v. Esper*, at 20:1–13 (D.D.C. Jan. 14, 2020),

---

[6] Plaintiffs do not allege that Secretary Wilkie harbored discriminatory intent.  Nor can plaintiffs make out the "strong showing of bad faith or improper behavior" that would be required to probe Secretary Wilkie's judgment.  *Dep't of Commerce*, 139 S. Ct. at 2573–74; *see also Franklin Savings Ass'n*, 922 F.2d at 211.  Despite vigorous litigation across five cases over nearly three years, there is no suggestion that DoD's policy was promulgated in bad faith, or that the government behaved improperly.  Accordingly, Plaintiffs have no basis to examine Secretary Wilkie's mental processes.

ECF 239; *accord Doe DC*, 917 F.3d at 737 (Williams, J., concurring in result) (noting that "the court should not bless (or invite) a futile fishing expedition into the executive's decision-making"). Given that the Panel's recommendations were the same policy adopted in the Report to Secretary Mattis and in then-Secretary Mattis's memorandum presenting the policy to the President, Plaintiffs have no need for deliberative information outside of the Panel's activities to understand if the current policy reflects the Panel's recommendations.

In fact, the Government has filed a mandamus petition in the Ninth Circuit seeking to vacate the district court's orders in the underlying action compelling the release of deliberative records never considered by the Panel, such as drafts of DoD's Report and deliberative documents relating to the Mattis memorandum. *See* Petition at 24, 25, *In re Trump*, No. 20-70365, ECF 1-2 (9th Cir. Feb. 11, 2020). That petition is currently pending. This Court should not allow Plaintiffs to circumvent the Ninth Circuit's administrative stay by compelling Secretary Wilkie to testify about the kind of privileged information contained in those documents. Indeed, the Ninth Circuit has already explained that "[d]ocuments involving the most senior executive branch officials . . . may require greater deference." *Karnoski*, 926 F.3d at 1206.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Quash should be granted, and Plaintiffs should be precluded from deposing the Secretary of Veterans Affairs.

Dated: May 20, 2020                             Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General
                                                Civil Division

G. ZACHARY TERWILLIGER
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

ANDREW E. CARMICHAEL
CHRISTOPHER D. EDELMAN
GRACE X. ZHOU
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8659
Email: christopher.edelman@usdoj.gov

 /s/ *Dennis C. Barghaan*
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2020, a copy of the document above was served by email to the following counsel of record for Plaintiffs and Plaintiff-Intervenor in the underlying action:

Jordan M. Heinz
KIRKLAND & ELLIS (IL)
300 North LaSalle
Chicago, IL 60654
312-862-2000
Email: Jheinz@kirkland.Com

*Counsel for Plaintiffs*

Chalia I. Stallings-Ala'ilima
OFFICE OF THE WASHINGTON ATTORNEY GENERAL
800 5th Ave, Ste 2000
Seattle, WA 98104-3188
206-464-7744
Email: Chalias@atg.Wa.Gov

*Counsel for Plaintiff-Intervenor*

A copy of the document above was also transmitted by email to additional counsel at the following addresses:

Vanessa Barsanti, vanessa.barsanti@kirkland.com
Mark Beckington, Mark.Beckington@doj.ca.gov
Ben Bistricer, Ben.Bistricer@lw.com
Lara Haddad, Lara.Haddad@doj.ca.gov
Marianne F. Kies, MKies@cov.com
Peter Komorowski, PKomorowski@cov.com
Chloe Korban, Chloe.Korban@lw.com
Nicholas M. Lampros, nlampros@cov.com
Jennifer L. Levi, jlevi@glad.org
Amie Medley, Amie.Medley@doj.ca.gov
Colleen Melody, colleen.melody@atg.wa.gov
Matthew Miller, MMiller@foleyhoag.com
Shannon Minter, sminter@nclrights.org
Amy Quartarolo, amy.quartarolo@lw.com
Thomas E. Redburn, tredburn@lowenstein.com
Peter C. Renn, prenn@lambdalegal.org
Daniel I. Siegfried, daniel.siegfried@kirkland.com

Meg Slachetka, MSlachetka@lowenstein.com
Chris Stoll, CStoll@nclrights.org
Jason Sykes, jason@newmanlaw.com
Dixie Tauber, Dixie.Tauber@lw.com
Harrison White, harrison.white@lw.com

   /s/ *Dennis C. Barghaan*
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant United States Attorney